***********
In accord with the decision of the North Carolina Court of Appeals, which affirmed in part and reversed in part, the prior decision of this panel, the Full Commission enters the following Opinion and Award to clarify what benefits, if any, must be paid.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS
1. At the time of Plaintiff's alleged work injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the parties at all times relevant to these proceedings.
3. Defendant was a self-insured employer with Crawford Company as its servicing agent at all times relevant to these proceedings.
4. Plaintiff's average weekly wage was $484.32 at all times relevant to these proceedings.
5. On May 5, 2003, Plaintiff sustained an injury by accident arising out of and in the course of his employment with Defendant. (North Carolina Industrial Commission File Number 376262).
6. On February 6, 2004, Plaintiff sustained an injury by accident arising out of and in the course of his employment with Defendant. (North Carolina Industrial Commission File Number 403017). *Page 3 
7. Plaintiff received temporary total disability compensation from February 6, 2004 through April 19, 2004, and from May 6, 2004 through September 14, 2004 at the rate of $322.90 per week.
8. On September 15, 2004, Plaintiff returned to work for Defendant, and continued working until November 4, 2004, but received wages until November 18, 2004. Plaintiff then began receiving unemployment compensation benefits for six (6) weeks at the rate of $234.00 per week until January 2005, and he received two (2) more weeks of unemployment compensation at that same rate in May 2005.
9. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One (1) — North Carolina Industrial Commission forms and filings (North Carolina Industrial Commission File Number 376262);
 b. Stipulated Exhibit Two (2) — North Carolina Industrial Commission forms and filings (North Carolina Industrial Commission File Number 403017);
 c. Stipulated Exhibit Three (3) — Plaintiff's medical records.
 *********** ISSUE
The remaining issue to be determined is: whether Plaintiff's May 5, 2003 and February 6, 2004 work injuries caused his lower back pain and other symptoms after November 4, 2004?
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. Plaintiff is 38 years old, with a date of birth of September 12, 1971. Plaintiff has a high school diploma, and began working for Defendant on February 10, 1999 as a maintenance person in the public works department. As of May 2003, Plaintiff's duties included laying water and sewer pipes, making taps into the water and sewer lines, and installing water meters.
2. On May 5, 2003, Plaintiff was working for Defendant when he sustained an admittedly compensable work injury when he slipped and fell head first into a sewer pit while replacing plumbing in the pit. Plaintiff's head and shoulders went into the sewer pit, and he was trapped there for a period of time. Plaintiff managed to work his way out of the sewer pit, but injured his back and right shoulder in the process. On May 6, 2003, Defendant sent Plaintiff to Dr. Angelo Anthony Tellis, a pain management specialist, who diagnosed him with lumbosacral strain/sprain and traumatic myalgias. Initially, Dr. Tellis restricted Plaintiff to sedentary work and prescribed medications. Eventually, Dr. Tellis ordered physical therapy and modified Plaintiff's work restrictions in order to allow him to perform light-duty tasks with no lifting greater than 15 pounds.
3. Despite medical treatment and less strenuous work duties, Plaintiff continued to complain of significant lower back pain, and by July 2003 he was having pain radiating into his left thigh. Dr. Tellis then ordered lumbar magnetic resonance imaging (MRI), which revealed mild disc desiccation at the L4-L5 level of the spine and a Tarlov cyst at the S2 nerve root, with mild mass effect on the right S1 nerve root. Since Plaintiff's symptoms were on the left side, Dr. Tellis did not believe that the Tarlov cyst was significant. On August 12, 2003, Dr. Tellis administered bilateral sacroiliac joint injections, which gave Plaintiff approximately a week of relief; however, his symptoms returned and worsened when he began to vomit and cough. *Page 5 
4. Following Plaintiff's May 5, 2003 work injury, Defendant provided him with sedentary and light-duty work within the restrictions ordered by Dr. Tellis. Although Defendant never filed a Form 60, Defendant paid for and directed Plaintiff's medical treatment. In September 2004, Defendant sent Plaintiff to Dr. Max Rolf Kasselt, an orthopaedist. Although Dr. Kasselt's opinions are stricken from the record of these proceedings due to his non-consensual, ex parte communication with the adjuster managing the workers' compensation claim for Defendant, his medical records concerning Plaintiff's complaints and course of treatment are summarized herein.
5. On September 24, 2003, Dr. Kasselt first saw Plaintiff, and noted that he was complaining of sharp, stabbing lower back pain with tingling and a numb sensation in his left leg and hand. Dr. Kasselt ordered a left hip MRI, which revealed no evidence of avascular necrosis. Dr. Kasselt then sent Plaintiff to Dr. Gregory Gridley, a psychologist. On October 23, 2003, Dr. Gridley saw Plaintiff, at which time he diagnosed Plaintiff with a conversion disorder with features of post-traumatic stress disorder and recommended a consultation with Dr. Edwin William Hoeper, a psychiatrist who specializes in post-traumatic stress disorder. On November 10, 2003, Dr. Hoeper saw Plaintiff and diagnosed him with conversion disorder and a probable lumbosacral muscle strain. It was Dr. Hoeper's opinion that Plaintiff had "somaticized anxiety" associated with the emotional stress of his May 5, 2003 work injury so that he was perceiving his symptoms to be worse than they actually were.
6. On October 2, 2003, Plaintiff returned to Dr. Tellis, at which time he reported increased pain in his lower back and down both of his legs, tingling and burning of his left hand, and drawing of his right hand at night. Dr. Tellis recommended electrodiagnostic studies. *Page 6 
However, Defendant would not authorize electrodiagnostic studies because Defendant transferred Plaintiff's care to Dr. Kasselt.
7. Dr. Kasselt prescribed Plaintiff medication and physical therapy, and ordered work restrictions. Dr. Kasselt subsequently stopped examining Plaintiff at follow-up appointments. In late January 2004, after a functional capacity evaluation, Dr. Kasselt released Plaintiff to full-duty work.
8. Since Plaintiff's pain and other symptoms were not improving with the medical care he was receiving, he sought treatment at his own expense from Dr. Amy Thornton Gatlin, a chiropractor, who treated him from October 30, 2003 through January 6, 2004. Plaintiff also went to his primary care physician, Dr. Nicholas Farina, who ordered nerve testing. The results of Plaintiff's nerve testing did not reveal any evidence of significant nerve compression, and so Dr. Farina did not recommend a referral to a neurosurgeon. However, Plaintiff's nerve testing did demonstrate mild left carpal tunnel syndrome and marked persistent spasm of the deep lumbar paraspinal muscles.
9. On February 6, 2004, Plaintiff was working for Defendant when he sustained another admittedly compensable work injury when he slipped, fell on his back, and struck his head while using a vacuum hose in a ditch. Due to neck and back pain, as well as numbness in Plaintiff's legs, he was unable to climb out of the ditch. Consequently, Plaintiff's co-workers called an ambulance, which took him to the hospital. Dr. Kevin Charles Geer, an emergency medicine physician, examined Plaintiff and found him to be neurologically intact but anxious and hyperventilating. Dr. Geer ordered that Plaintiff remain out of work for three (3) days and restricted him to light-duty work. *Page 7 
10. On February 8, 2004, Plaintiff returned to the emergency department, reporting that he almost fell twice since his February 6, 2004 work injury, and that he was experiencing numbness on the bottom of his feet. An MRI revealed no evidence of disc herniation, spinal stenosis, or neuroforaminal stenosis. The medical records from this February 8, 2004 emergency department visit were not complete, and so the diagnosis, treatment recommendations, and work restrictions from this visit are not a part of the record of these proceedings.
11. Defendant admitted the compensability of Plaintiff's February 6, 2004 work injury via a Form 60, and sent Plaintiff to Dr. Virginia Wooten Ward, a family medicine physician, who examined him on February 10, 2004. Dr. Ward noted that Plaintiff had an extreme pain response when she palpated his back muscles, and that it was difficult to examine him due to his over-reaction to touch and to requested movements. Dr. Ward kept Plaintiff out of work, prescribed medications, and ordered a functional capacity evaluation, which was to be followed by a work-hardening program because Plaintiff was so out of shape.
12. On February 11, 2004, Plaintiff sought treatment at his own expense with Dr. Brian John Battersby, Jr., an orthopaedist. Dr. Battersby recommended that Plaintiff walk and exercise in order to build up his strength. Dr. Battersby also switched Plaintiff's medication from Bextra to Vioxx.
13. Dr. Ward subsequently recommended that Plaintiff be evaluated by Dr. Jeffrey Norman Pierce, a pain management specialist, as did another physician in Dr. Ward's practice who examined Plaintiff. However, Defendant would not authorize any referral except to Dr. Kasselt, and Plaintiff did not want to return to him. As a family medicine physician, Dr. Ward felt that she was out of her league, and she noted that Plaintiff's case presented a "very confusing picture" to her. Plaintiff did undergo the functional capacity evaluation that Dr. Ward *Page 8 
recommended. The results of the functional capacity evaluation indicated that it was a "mostly valid" test, and that Plaintiff should be able to safely work in a sedentary or light-duty position involving no handling of materials at floor-level.
14. On April 20, 2004, Defendant offered Plaintiff light-duty work which involved performing office-type work. Plaintiff had problems staying awake due to the medication that he was taking. Due to Plaintiff's difficulty staying awake while performing the light-duty work, his supervisor ultimately sent him home.
15. Plaintiff continued to report symptoms of radicular pain, and Dr. Ward recommended that he see a neurologist at his own expense, since Defendant would not authorize the referral. On May 6, 2004, Plaintiff presented to Dr. Michael Phillip Apostolou, a neurologist, who felt that he was suffering from radicular pain. Dr. Apostolou prescribed Plaintiff various medications and took him out of work. Plaintiff did not respond as expected to the medications prescribed, and so Dr. Apostolou recommended electrodiagnostic testing. It took some time before Defendant would authorize the electrodiagnostic testing. On September 10, 2004, Plaintiff underwent the electrodiagnostic testing. By that time, Dr. Apostolou released Plaintiff to return to work within the guidelines of the previous functional capacity evaluation.
16. The electrodiagnostic testing did not provide a clear indication of what was causing Plaintiff's symptoms of radicular pain. There was evidence of demyelinative damage to some peripheral nerves, which would not likely be traumatic in origin. The tests also revealed delays in the F-waves to two (2) motor nerves in Plaintiff's legs, which could indicate a problem at the nerve roots of the lumbar spine, but Plaintiff had a normal "H" reflex and good strength in his legs, which would indicate that there was no problem there. *Page 9 
17. In September 2004, Plaintiff began complaining of worsening pain although he did not sustain further injury or perform significant work activity. Plaintiff's worsening pain puzzled Dr. Apostolou, particularly in view of the conflicting electrodiagnostic testing results. Dr. Apostolou questioned the relationship between Plaintiff's worsening pain and his May 5, 2003 and February 6, 2004 work injuries.
18. Defendant gave Plaintiff a light-duty job marking the location of water and sewer lines. However, after reviewing Dr. Apostolou's office note questioning the relationship between Plaintiff's worsening pain and his May 5, 2003 and February 6, 2004 work injuries, Defendant stopped authorizing further medical treatment and advised Plaintiff that light-duty work would no longer be provided as of November 5, 2004. Consequently, Plaintiff stopped working on November 4, 2004, and Defendant did not resume payment of Plaintiff's workers' compensation benefits after that date. Plaintiff remained out of work until January 17, 2005, when he began driving a dump truck on a part-time basis for a trucking company. Plaintiff drove a dump truck for several months, but the bouncing motion of the truck caused him to experience increasing back pain. By April 2005, Plaintiff was having considerable difficulty getting out of the dump truck, and he stopped working after April 22, 2005.
19. Except for an emergency department visit on October 16, 2004, in which the emergency department physician recommended a pain management consultation, Plaintiff did not receive further known medical care until July 20, 2005, when he went back to Dr. Tellis. The last time Plaintiff saw Dr. Tellis was in November 2003. Dr. Tellis reviewed Plaintiff's history of sustaining the February 6, 2004 work injury and subsequent treatment, but was unable to specifically identify the etiology of Plaintiff's lower back and leg pain. On August 3, 2005, Dr. Tellis administered a left sacroiliac joint injection with the thought that Plaintiff's continued lower *Page 10 
back and leg pain might be due to sacroiliitis. There was no indication that Dr. Tellis ever saw Plaintiff again in follow-up.
20. On August 22, 2005, Plaintiff presented to the emergency department again. An MRI performed that day revealed similar findings as the previous ones. Plaintiff received a referral to Dr. Kurt Voos, an orthopaedist, by the emergency department physician.
21. Plaintiff then received sponsorship from the North Carolina Division of Vocational Rehabilitation Services and was able to receive further medical treatment. On September 2, 2005, Ms. Ursula Lynell Van Dyck, Dr. Voos' physician's assistant, saw Plaintiff and noted abnormal neurological findings. Ms. Van Dyck ordered cervical and lumbar myelograms in order to rule out any impingement on Plaintiff's spinal cord or nerve root compression. At Plaintiff's follow-up visit, Dr. Voos examined him and reviewed the myelogram, as well as the MRI performed in August 2005. Dr. Voos found no evidence of spinal cord impingement in the cervical spine and no evidence of nerve impingement in the lumbosacral spine, except for the Tarlov cyst. The disc at the L4-L5 level of the spine was bulging somewhat, and Dr. Voos thought that it might be degenerative. Dr. Voos was of the opinion that a discogram would be necessary in order to verify his impressions, and until Plaintiff's symptoms became intolerable, he did not believe a discogram would be warranted. Consequently, Dr. Voos ordered physical therapy, including aquatherapy.
22. On November 21, 2005, Plaintiff returned to Dr. Voos, at which time he reported some improvement from the aquatherapy. As a result, Dr. Voos ordered Plaintiff to continue with the aquatherapy. Dr. Voos last saw Plaintiff on March 20, 2006, at which time he was still complaining of persistent lower back pain. Not having much to offer Plaintiff at that point, Dr. Voos recommended that he seek treatment from a pain clinic. *Page 11 
23. Following Plaintiff's May 5, 2003 work injury, he missed work in order to attend medical and physical therapy appointments. In addition, due to Plaintiff's lower back and leg pain, he missed a number of days of work in January 2004. Defendant did not pay Plaintiff any indemnity compensation for these days that he lost time or missed work. Rather, Defendant required Plaintiff to use accrued sick and vacation leave. Although Plaintiff did not have medical authorization to be out of work except for physician's and physical therapy appointments, Plaintiff's testimony that he was unable to work on those days in January 2004 is accepted as credible. However, the evidence presented was not specific regarding the days and periods that Plaintiff lost from work, and so no further findings can be made.
24. The parties presented no evidence regarding whether Plaintiff sustained any permanent partial disability as a result of his May 5, 2003 work injury. However, Plaintiff was still complaining of pain and was receiving follow-up medical care for the May 5, 2003 work injury when the February 6, 2004 work injury occurred.
25. Plaintiff's February 6, 2004 work injury materially aggravated his pre-existing back condition, causing him to become totally disabled for a period of time. Defendant paid Plaintiff temporary total disability compensation for the periods of his total disability until September 15, 2004, when he returned to work with Defendant in a light-duty position. Defendant terminated the payment of temporary total disability compensation to Plaintiff after September 15, 2004. After Plaintiff stopped working for Defendant on November 4, 2004, he continued to receive wages through November 18, 2004, presumably for accrued sick and vacation leave.
26. Plaintiff reasonably looked for other employment from November 2004 until January 17, 2005, when he began working for a trucking company. From January 17, 2005 through April 22, 2005, Plaintiff was only able to earn an average of $300.00 per week, which *Page 12 
was $184.32 less than his average weekly wage at the time of his May 5, 2003 and February 6, 2004 work injuries. Plaintiff was unable to continue working for the trucking company after April 22, 2005, due to his persistent complaints of lower back and leg pain.
27. Plaintiff's psychological response to his May 5, 2003 and February 6, 2004 work injuries complicated his recovery from them. Due to Plaintiff's somaticized anxiety associated with emotional stress from his May 5, 2003 and February 6, 2004 work injuries, he tended to focus on and exaggerate physical symptoms. However, Defendant's failure to provide Plaintiff with appropriate medical care also impeded Plaintiff's recovery. Defendant would not authorize the referrals recommended by Dr. Ward, a physician they chose to treat Plaintiff. Defendant stopped providing any medical treatment to Plaintiff after receiving Dr. Apostolou's September 21, 2004 office note, which questioned the causation of Plaintiff's current complaints of lower back and leg pain, based upon his examination and electrodiagnostic testing of Plaintiff. Thereafter, Plaintiff paid for medical treatment on his own. There is still insufficient evidence from which to find that Plaintiff is at maximum medical improvement.
28. The Full Commission finds, based upon the greater weight of the evidence, and in accordance with the April 15, 2008 Opinion of the North Carolina Court of Appeals, that Plaintiff failed to establish, by the greater weight of the evidence, that his May 5, 2003 and February 6, 2004 work injuries caused his lower back pain and other symptoms after November 4, 2004, as the medical evidence of record is too speculative to establish medical causation and disability after that date. Thus, Plaintiff is not entitled to receive any workers' compensation benefits after November 4, 2004.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the *Page 13 
following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment with Defendant on May 5, 2003 to his lower back and right shoulder. N.C. Gen. Stat. § 97-2(6) (2009).
2. Although Plaintiff sustained some temporary total and/or temporary partial disability as a result of his May 5, 2003 work injury and may be entitled to indemnity compensation for that disability after the seven-day waiting period, the evidence was not sufficient to determine with specificity the amount of indemnity compensation due. Defendant is not entitled to a credit for the sick and vacation leave that Plaintiff used in connection with his May 5, 2003 work injury as his employment contract with Defendant entitled him to receive those benefits. N.C. Gen. Stat. §§ 97-28, 97-29, 97-30 (2009);Estes v. N.C. State University,89 N.C. App. 55, 365 S.E.2d 160 (1988).
3. As a result of Plaintiff's May 5, 2003 and February 6, 2004 work injuries, Plaintiff is entitled to have Defendant pay for all medical treatment reasonably related to these work injuries, including out-of-pocket medical expenses incurred prior to November 4, 2004. N.C. Gen. Stat. §§ 97-2(19), 97-25 (2009).
4. Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment with Defendant on February 6, 2004 to his lower back for which he received temporary total disability compensation from February 6, 2004 through April 19, 2004 and from May 6, 2004 through September 14, 2004 at the rate of $322.90 per week. N.C. Gen. Stat. § 97-2(6) (2009). *Page 14 
5. Plaintiff failed to establish, by the greater weight of the evidence, that his May 5, 2003 and February 6, 2004 work injuries caused his lower back pain and other symptoms after November 4, 2004, as the medical evidence of record is too speculative to establish medical causation and disability after that date. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. If not already paid, the parties shall confer and agree upon the amount, if any, of temporary total and/or temporary partial disability compensation due Plaintiff as a result of his May 5, 2003 work injury after the seven-day waiting period, and Defendant shall pay the stipulated amount to Plaintiff, subject to the attorney's fee approved for Plaintiff's former attorney below.
2. Defendant shall pay all medical expenses incurred by Plaintiff, which are reasonably related to his May 5, 2003 work injury according to the provisions of the North Carolina Workers' Compensation Act. Defendant shall reimburse Plaintiff for his out-of-pocket medical expenses related to his May 5, 2003 work injury.
3. Defendant is not obligated to pay any further indemnity compensation to Plaintiff in addition to the compensation already paid for his February 6, 2004 work injury.
4. Defendant shall pay all medical expenses incurred by Plaintiff as a result of his February 6, 2004 work injury through November 4, 2004 in accordance with the provisions of the North Carolina Workers' Compensation Act. Defendant shall reimburse Plaintiff for any and all *Page 15 
out-of-pocket medical expenses incurred by him that are related to his February 6, 2004 work injury through November 4, 2004.
5. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's former counsel from the sums due Plaintiff under paragraph one (1) above. Defendant shall deduct and pay directly to Plaintiff's counsel, 25 percent of the accrued compensation owed to Plaintiff.
6. Defendant shall pay the costs of these proceedings.
This the ___ day of March 2010.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ DANNY LEE McDONALD COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1